UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-23948-CIV-MORENO/O'SULLIVAN

ALEXANDRA H.,

      Plaintiff,

v.

OXFORD HEALTH INSURANCE, INC.,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS MATTER comes before the Court on the parties' cross-motions for summary judgment. See Defendant Oxford Health Insurance, Inc.'s Motion for Summary Judgment and Memorandum of Law in Support of Its Motion for Summary Judgment (DE# 164, 9/30/14); Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172, 10/15/14). This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) for a report and recommendation. See Order of Referral to Magistrate Judge O'Sullivan for All Pretrial Proceedings (DE# 176, 10/20/14). Having reviewed the applicable filings and the law, the undersigned respectfully RECOMMENDS that the Defendant Oxford Health Insurance, Inc.'s Motion for Summary Judgment and Memorandum of Law in Support of Its Motion for Summary Judgment (DE# 164, 9/30/14) be **GRANTED** and that the Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172, 10/15/14) be **DENIED** reasons stated herein.

## BACKGROUND[1]

On November 2, 2011, Alexandra H. (hereinafter "plaintiff") filed the instant action seeking to recover plan benefits, enforce rights under the plan and clarify entitlement to plan benefits pursuant to 29 U.S.C. § 1132 (a)(1)(B) of the Employee Retirement Income Security Act of 1974 (hereinafter "ERISA") against Oxford Health Insurance Inc. Freedom Access Plan (hereinafter "Freedom Access Plan") and Oxford Health Insurance, Inc. See Complaint (DE# 1, 11/2/11). Defendant Freedom Access Plan was dismissed with prejudice from this action on January 24, 2012. See Order of Dismissal with Prejudice as to Freed[om] Access Plan (DE# 36, 1/24/12).

On September 30, 2014, defendant Oxford Health Insurance, Inc. (hereinafter "defendant") filed its motion for summary judgment, statement of material facts and notice of filing declarations and exhibits in support of its summary judgment motion. See Defendant Oxford Health Insurance, Inc.'s Motion for Summary Judgment and Memorandum of Law in Support of Its Motion for Summary Judgment (DE# 164, 9/30/14); Defendant's Statement of Material Facts (DE# 165, 9/30/14); Defendant, Oxford Health Insurance Inc.'s Notice of Filing (DE# 166, 9/30/14). The plaintiff filed her responses in opposition to the motion and the statement on October 17, 2014. See Plaintiff's Response to Defendant's Motion for Summary Judgment and Memorandum of Law (DE# 174, 10/17/14); Plaintiff's Response to Defendant's Statement of Material Facts (DE# 175, 10/17/14). The defendant filed its reply on November 3, 2014. See

---

[1] When citing to the parties' filings, the undersigned will use the page numbers automatically assigned by the Court's CM/ECF system on the top right hand corner of each page.

2

Defendant Oxford Health Insurance, Inc.'s Reply on its Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 181, 11/3/14).

The plaintiff filed her motion for summary judgment and statement of material facts on October 15, 2014. See Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172, 10/15/14); Plaintiff's Statement of Material Facts (DE# 173, 10/15/14). The defendant filed its responses in opposition to the motion and the statement on November 10, 2014. See Defendant Oxford Health Insurance, Inc.'s Opposition to Plaintiff's Motion for Summary Judgment (DE# 182, 11/10/14); Defendant Oxford Health Insurance, Inc.'s Counter-Statement to Plaintiff's Statement of Material Facts (DE# 183, 11/10/14). The plaintiff filed her reply on December 1, 2014. See Plaintiff's Reply in Support of Her Motion for Summary Judgment (DE# 186, 12/1/14). This matter is ripe for adjudication.

## FACTS[2]

### A.    The Plan

The plaintiff is a New York resident enrolled in a welfare benefit plan (the "Plan") governed by ERISA and sponsored by her employer, St.. Ann's School. (R. 146-427; 877).[3]

---

[2] The undersigned will summarize only the facts which are pertinent to the Court's consideration of the cross-motions for summary judgment. The parties dispute significant portions of the enumerated facts listed in the opposing side's statement of undisputed facts even though the medical records and written correspondence speak for themselves.

[3] Citations to the record will be indicated as "(R. ___)." The page numbers will correspond to the Bates stamp numbers appearing on the bottom right hand corner of each page. The record can be found in the Plaintiff's Response to the Court's Order to Show Cause (DE# 130, 8/28/13), the Defendant Oxford's Supplemental Memorandum

The defendant issued to the plaintiff a Certificate of Coverage setting forth the terms, limitations, conditions and exclusions of coverage under the Group Enrollment Agreement between St. Ann's School and the defendant. (R. 146-427). Anorexia nervosa, major depressive disorder and obsessive compulsive disorder ("OCD") are defined as "Biologically Based Mental Illnesses" under the Plan. (R. 398). The Plan covers the "diagnosis and treatment of Biologically Based Mental Illnesses" that are "received on an inpatient, partial hospitalization or outpatient basis." Id.

The Plan defines the term "medically necessary" as follows:

Medically Necessary: Services or supplies as provided by a Hospital, Skilled Nursing Facility, Physician or other provider required to identify or treat your illness or injury and which, as determined by Our Medical Director, are:

1. Consistent with the symptoms or diagnosis and treatment of your condition;

2. Appropriate with regard to standards of good medical practice;

3. Not solely for your convenience or that of any provider; and

4. The most appropriate supply or level of service which can safely be provided. For inpatient services, it further means that your condition cannot safely be diagnosed or treated on an outpatient basis.

(R. 450).

## B.    The Plaintiff's Relevant Medical History

At the time the instant motions were filed, the plaintiff was 32 years old. The

_____

of Law Responding to Plaintiff's Response to the Court's Order to Show Cause (DE# 134, 9/18/13) and the Defendant, Oxford Health Insurance Inc.'s Notice of Filing (DE# 166, 9/30/14).

plaintiff has had a long-term struggle with anorexia, restricting type, which began when she was fourteen years old. (R. 877). The plaintiff has also been diagnosed with major depressive disorder, recurrent, severe and obsessive compulsive disorder. (R. 468).

On or about November 9, 2009, the plaintiff was admitted to the Oliver-Pyatt Centers, an out-of-network residential treatment center located in Miami, Florida. (R. 877-881). At the time of admission, the plaintiff was 5'6," weighed 97 pounds[4] and had a daily intake of between 600 and 900 calories. (R. 878). The plaintiff's prior hospitalizations were summarized as follows:

> She has been hospitalized approximately 15 times for her eating disorder. She was hospitalized at Westchester NY Presbyterian hospital approximately 7-8 times but reported that although she was weight restored, that the "putative" and "restrictive" environment at the unit was traumatizing and not helpful. She also received treatment at the North Shore and Long Island Jewish Hospital inpatient units. Most recently she attended the inpatient unit at Princeton (March 2009) and UNC Chapel Hill (Summer 2009)[.] Patient also was treated at a number of day treatments which include North Shore Day Program (no longer open), Long Island Jewish Hospital Day Program, and Renfrew Day Program. Patient reported that she responded better to programs with individualized treatment and a more humanistic approach. She has also received pharmacological treatment for panic attacks in the past and is currently prescribed medication for[ ] depression, [Attention Deficit Hyperactivity Disorder] and [Obsessive Compulsive Disorder].

(R. 879).

The plaintiff reported two suicide attempts in her early 20s and indicated that "as a teenager she would cut her arms with a razor." (R. 880). This behavior was "precipitated by a binge or when she felt she had gained weight." Id.

After her discharge from Oliver-Pyatt Centers, the plaintiff continued to struggle

---

[4] In notes from a Nutritional Follow Up and Assessment dated January 10, 2011, the plaintiff's goal weight was listed as between 120 and 130 pounds. (R. 507).

with her illness. From July 6, 2010 until July 23, 2010, the plaintiff was admitted to a partial hospitalization facility. (R. 535). When she was discharged from that facility she weighed 110 pounds. Id.

On December 14, 2010, the plaintiff was again admitted to the Oliver-Pyatt Centers on a partial hospitalization basis for treatment of anorexia nervosa, obsessive compulsive disorder and major depressive disorder. (R. 534). The plaintiff sought treatment at the Oliver-Pyatt Centers on the recommendation of her psychiatrist and her therapist. (R. 468).

The Individual Authorization Report for this period indicates that the plaintiff was seeking partial hospitalization "due to being underweight and not being able to gain the weight in an outpatient setting." (R. 534). The notes further state that the plaintiff had passive suicidal ideation, had a history of suicide attempts in her early twenties and experienced an overdose in June 2010. Id. On December 20, 2010, the notes indicate that the plaintiff had some passive suicidal ideation and "made a suici[d]e attempt some weeks ago." (R. 535).

As of March 18, 2010,[5] the plaintiff "had a history of multiple relapses requiring hospitalization (19 times) with three of those hospitalizations [occurring in] the past year or so."  (R. 430).

**C.  The Defendant's Coverage Determinations and the Plaintiff's Internal Appeals**

The defendant initially approved coverage for the Oliver-Pyatt Centers' mental

---

[5] This was the date the external reviewer issued his determination. (R. 428-432).

health partial hospitalization treatment of the plaintiff from December 14, 2010 through December 16, 2010. (R. 535). On December 20, 2014, the defendant's Associate Medical Director, Dr. Satwant Ahluwalia,[6] performed a concurrent medical record review of the plaintiff's case and determined that an additional week of partial hospitalization treatment was "medically necessary" through December 26, 2010. Id.

On December 27, 2010, Angie Gonzalez (the Oliver-Pyatt Centers' therapist) asked the defendant to approve another week of mental health partial hospitalization treatment for the plaintiff at the Oliver-Pyatt Centers. (R. 535). On the same day, Dr. Ahluwalia performed a concurrent medical record review of the plaintiff's case and determined that an additional week of partial hospitalization treatment was "medically necessary" through January 3, 2011. Id.

On January 4, 2011, Dr. Karen Lawson (a physician at the Oliver-Pyatt Centers) requested that the defendant approve additional mental health partial hospitalization treatment for the plaintiff. (R. 536). On the same day, Dr. Ahluwalia determined that partial hospitalization was not "medically necessary" as of January 5, 2011. Id.  Dr. Ahluwalia opined that the plaintiff did not meet the United Behavioral Health ('"UBH")[7] guidelines criteria for continued partial hospitalization treatment because she showed

---

[6] The defendant asserts that Dr. Ahluwalia is board certified in Psychiatry and Child and Adolescent Psychiatry. See Defendant's Statement of Material Facts (DE# 165 at ¶28, 9/30/14) (citing R. 535). However, the document (R. 535) cited by the defendant does not contain this information and the undersigned has not been able to find record evidence supporting Dr. Ahluwalia's board certification.

[7] UBH is the entity "responsible for making benefit coverage determinations for mental health and substance abuse services provided to Oxford members." (R. 517).

"improvement in symptoms and functioning with no severe symptoms noted at [that]

time." (R. 530).

On January 4, 2011, a UBH case manager sent a letter notifying the plaintiff that

UBH had denied her request for partial hospitalization as not medically necessary. (R.

519).  The letter stated in part: "Per UBH level care guidelines noncerted [sic] for Partial

hospital mental health service. The member was admitted to PHP 12/14/10. Has shown

improvement in symptoms and functioning with no severe symptoms noted at this time.

Ongoing treatment needs can be addressed in an intensive outpatient level of care."  Id.

The letter further stated:

> We have enclosed a detailed explanation of the member's appeal rights.
> A member has the right to request a review of a denial of services. If the
> member would like to appeal, the member should follow the First-Level
> Member Appeal process described in the response to the question, *"How
> do I submit a First-Level Appeal request?"*

Id. (italics in original). The plaintiff appealed the denial determination.

On January 6, 2011, UBH issued a letter to the plaintiff upholding the

determination to deny coverage for partial hospitalization. (R. 517-18). The letter stated

in part:

> As requested, a first level urgent appeal review was completed on
> January 5, 2011 at 3:30 p.m. central standard time on a request we
> received on January 4, 2011.
>
> This review involved a telephone conversation with your provider. After
> review of all available information, it was my determination that benefit
> coverage is not available for the following reason(s):
>
> It is my determination to uphold the previously denied mental health
> partial hospitalization programming benefit coverage from January 5,
> 2011 forward. The rationale, based on lack of medical necessity per UBH

> Level of Care Guidelines for this level of care, is that improvements
> in the initial precipitating symptoms has been noted and there no longer
> appear to be such significant impairments in psychosocial functioning, due
> to severe symptoms/behaviors, requiring this intensity of structure and
> monitoring. It appears treatment could continue in a less restrictive
> setting, such as mental health intensive outpatient programming and
> medication management sessions, which would be initially authorized
> within available benefits.

(R. 517). The letter also stated:

> We have enclosed a detailed explanation of the member's appeal rights.
> A member has the right to request a review of a denial of services. If the
> member would like to appeal the services denied in this notice, the
> member should follow the appeal procedure described in the enclosure in
> response to the question, *"How do I appeal this determination?"* This
> decision is considered a final adverse determination (FAD) under NY law.

(R. 518) (italics added). The letter was signed by Dr. Lee H. Becker, Associate Medical

Director, Board Certified in Psychiatry. Id.

The Oliver-Pyatt Centers wrote a letter asking UBH to reconsider its decision to

deny coverage for further partial hospitalization treatment. (R. 468-472). The letter was

dated January 17, 2011 and signed by Dr. Wendy Oliver-Pyatt and four other medical

professionals from the Oliver-Pyatt Centers. (R. 472). The letter stated in part:

> In this current denial, Alexandra was labeled as "chronic," because she
> has never been allowed the opportunity to see treatment through to
> completion. Therefore, her premature discharges and step-downs have
> perpetuated the chronicity of her condition. Denying her at this time and
> suggesting that a lower level of care is appropriate is irresponsible and is
> putting Alexandra's life at risk. Throughout her care, our team is in contact
> with Alexandra's outpatient treatment team and they are in support of
> continuing in a Partial Hospitalization level of care.

(R. 468). The letter noted that the plaintiff has not been successful in outpatient

treatments:

> Alexandra has been unable to sustain her recovery on an outpatient
> basis, and has had approximately 19 prior inpatient treatment
> experiences, which resulted in temporary weight gain followed by
> deterioration of her condition upon discharge. Alexandra most recently
> was treated in inpatient settings on three occasions in 2009; once at
> Princeton (3/09), once at UNC in Chapel Hill (Summer 09) and once at
> Oliver-Pyatt Centers (12/09).

> Because Alexandra has been treated in multiple inpatient and [sic]
> facilities in the past, the Director of Oliver-Pyatt Center[s] held meetings
> with Alexandra and her physician prior to her admission to determine what
> the impact of prior treatment was, and to determine the most effective
> approach to assure that treatment specific to her needs would be
> implemented.

(R. 468-69). The letter also quoted the five criteria which the American Psychiatric

Association deemed appropriate for a patient to receive a "partial level of care:"

> 1) Medically stable to the extent that IV fluids, NG tube feeding, and
> multiple dally labs are not needed

> 2) Without suicidality

> 3) Weight is generally > 80% IBW

> 4) Partially motivated with repetitive intrusive thoughts of the eating
> disorder for > 3 hours daily

> 5) Needs structure to gain weight (Alexandra clearly needed support at all
> meals and continues to need support at all meals. However, she does not
> need 24 hour nursing care.)

(R. 470). The letter noted that the plaintiff met all of these guidelines and "has been

making marked progress in treatment." Id. The letter recounted that:

> At the time of Alexandra's admission the case manager determined that
> she did not meet criteria for residential level of care. At this time,
> authorization was given for Partial Hospitalization. At the time of the denial
> on January 5, 2011, [d]isrupting treatment and interfering with continuity of
> care would most certainly lead to regression in this patient and is

10

contraindicated. Alexandra was struggling with severe depression, and suicidal ideation. Her mental status was notable for flat affect, powerfully dysphoric mood, feelings of hopelessness, helplessness, and severely distorted thinking concerning her body and her own worth. She was felt to be at high risk from a safety perspective were she to be outside of the structured setting of treatment. The treatment team was working to help her be able to continue with completing meals (she was on 1600 calories), which is not sufficient quantity for her to function independently and certainly is not enough for her be [sic] maintained on. She had engaged well with her primary therapist and was beginning to accept the idea of trying alternate medications which she had not previously been exposed to. Because of the severity of the eating disorder combined with severe and not stabilized Major Depression, it was highly inappropriate and dangerous to step her down to a lower level of care. She was felt to be unpredictable from a safety perspective without the support of the treatment center. It should be noted that within the past year this patient did make a serious suicide attempt. Her safety remains a high priority as she continues in treatment.

Had Alexandra not been admitted to the Oliver-Pyatt Centers, immediately, there was an expectation that she would have continued to have a deteriorated mental status and continued weight loss; thus the need for immediate placement in a facility that was consistent with her level of symptoms and clinical presentation was deemed necessary.

(R. 470-71). The letter noted that the plaintiff "continues to progress in treatment" and that she is "both medically and psychologically appropriate for this level of care." (R. 471). The letter concluded that: "Given her treatment refractory symptoms, and multiple inpatient hospitalizations, it was abundantly clear that a new (and individualized approach) be implemented for Alexandra, in order [to] give her the opportunity to recover from this life-threatening and life-destroying biologically based psychiatric illness." (R. 472).

On January 24, 2011, the Oliver-Pyatt Centers wrote another letter to UBH. (R. 473). The body of the letter stated in its entirety:

It is incomprehensible to discharge this patient in her current condition.

11

The reviewer incorrectly stated that Alexandra was "chronic" and therefore justified discharging her. Though Alexandra has had multiple treatments, she has presented on this admission with a greater conviction about her need to recover, but most importantly, she is being treated for a severe and life threatening co-occurring depression. She is beginning to respond to and benefit from the new medication which has been implemented (Abillify). Because her mood, affect and cognitive status are beginning to improve, she is more and more able to respond to all components of treatment. To say that she is "chronic" when she has a co-occurring severe depression (which has yet to be fully treated) is medically irresponsible, incongruent with level of care recommendations, and is outside of standards of practice for treatment of eating disorders and depression. In fact, it would be extremely dangerous from a safety perspective to discharge this patient and place her in a lower level of care. She made a several [sic] suicide attempts in her life, and did recently make a suicide attempt via overdose of medication. Her degree of depression, social isolation and level of illness cause her treatment team to consider her a high risk for a serious and adverse outcome if she is discharged prematurely.

Id.

On February 8, 2011, UBH sent a letter to the plaintiff. (R. 461-463). The letter stated that UBH's medical director would be upholding the defendant's adverse determination on the second-level administrative appeal based on the plaintiff's clinical information, which did not demonstrate that continued mental health partial hospitalization treatment was "medically necessary" as of January 5, 2011. (R. 461-63). The letter also stated that it was the medical director's opinion that the plaintiff could be safely treated at a lower level of care, such as intensive outpatient treatment. (R. 461). The letter summarized the medical director's rationale supporting his adverse "medical necessity" determination as follows:

There are no complicating medical issues. Weight, vital signs and lab values are stable. There is no serious risk of harm to self or others. There is no psychosis. There is participation in treatment. There is no evidence that the patient would require a higher level of care without this intensity of

12

services.

Id.

The letter further stated: "This is UBH's final position on this matter." (R. 461). It informed the plaintiff that she had the right to file an external appeal and enclosed instructions on how to do so, as well as the right to file a civil action under section 502(a) of ERISA. (R. 461-462). The letter was signed by Dr. Theodore A. Allchin, Associate Medical Director, Board Certified in Psychiatry and Child and Adolescent Psychiatry. (R. 463).

**D.     The New York State External Appeal Process**

The Plan provides that a member may internally appeal an adverse medical necessity determination. If a member receives a final adverse medical necessity determination through the defendant's internal appeal process, the member has the right to submit an external appeal to the State of New York.

The Certificate states "Request for External Appeals that have been determined by the superintendent to be eligible for External Appeal will be randomly assigned to a Certified External Appeal Agent according to a process prescribed by the commissioner and superintendent." (R. 195, 324). The Certificate also states that on external appeal, the External Appeal Agent reviews "[the defendant's Final Adverse Determination] and will make a determination as to whether [the defendant] acted reasonably and with sound medical judgment and in [the member's] best interest." Id.

In the instant case, this Court has examined at length the external appeals

process provided by the New York statute and summarized it as follows:

> New York has enacted a law governing insured health plans, including
> ERISA insured plans, that establishes "an insured's right to an external
> appeal of a final adverse determination by a health plan." N.Y. Ins. Law §
> 4910(a). In relevant part, the New York law provides,
>
> > (b) An insured . . . shall have the right to request an external
> > appeal when:
> >
> > (1) (A) the insured has had coverage of the health care
> > service, which would otherwise be a covered benefit under a
> > subscriber contract or governmental health benefit program,
> > denied on appeal, in whole or in part, pursuant to title one of
> > this article on the grounds that such health care service does
> > not meet the health care plan's requirements for **medical
> > necessity**, appropriateness, health care setting, level of
> > care, or effectiveness of a covered benefit, and
> >
> > (B) the health care plan has rendered a final adverse
> > determination with respect to such health care service or
> > both the plan and the insured have jointly agreed to waive
> > any internal appeal, or the insured is deemed to have
> > exhausted or is not required to complete any internal
> > appeal....
>
> N.Y. Ins. Law § 4910(b)(1) (emphasis added). New York courts have
> concluded that this external appeals process is a function of the state.
> See Vellios v. Serio, 1 Misc.3d 487, 764 N.Y.S.2d 568, 569-70 (N.Y. Sup.
> Ct. 2003) (finding external appeals agents function on behalf of the state).
>
> An insured has four months to initiate an external appeal, which is then
> randomly assigned by the New York agency to a certified external
> reviewer. Id. § 4914(a), b(1). When reviewing a medical-necessity
> determination,
>
> > the external appeal agent shall review the utilization review
> > agent's final adverse determination and, in accordance with
> > the provisions of this title, **shall make a determination as
> > to whether the health care plan acted reasonably and
> > with sound medical judgment and in the best interest of
> > the patient.** When the external appeal agent makes its
> > determination, it shall consider the **clinical standards of the
> > plan, the information provided concerning the patient,**

14

**the attending physician's recommendation, applicable and generally accepted practice guidelines developed by the federal government, national or professional medical societies, boards and associations.** Provided that such determination shall:

(i) be conducted only by one or a greater odd number of clinical peer reviewers,

(ii) be accompanied by a notice of appeal determination which shall include the reasons for the determination; provided, however, that where the final adverse determination is upheld on appeal, the notice shall include the clinical rationale, if any, for such determination,

(iii) be subject to the terms and conditions generally applicable to benefits under the evidence of coverage under the health care plan,

(iv) be binding on the plan and the insured, and

(v) be admissible in any court proceeding.

Id. § 4914(b)(4)(A) (emphasis added). Although the New York law states that the external review is binding and admissible in any court proceeding, the statute provides no express cause of action. New York courts have also explained that the external appeal is not binding on the parties in the same way that an arbitration award is binding. See Nenno v. Blue Cross & Blue Shield of W.N.Y., 303 A.D.2d 930, 757 N.Y.S.2d 165, 168 (N.Y. App. Div. 2003).

Alexandra H. v. Oxford Health Ins., Inc., No. 11-23948-CIV, 2013 WL 4002883, at *4-5

(S.D. Fla. Aug. 6, 2013) (emphasis in original; footnotes omitted).

**E.     The New York State External Appeal Determination**

The plaintiff opted into the external appeal process governed by New York law.

By letter dated February 24, 2011, the State of New York notified the defendant that the

plaintiff had filed an external appeal. (R. 438-42). The N.Y. Insurance Department

assigned the external appeal to the Medical Care Ombudsman Program, MCMC. Id.

MCMC is certified by the State of New York as an external appeal agent authorized to conduct external reviews of adverse medical necessity determinations. (R. 434, 439).

MCMC certified that the records received from the defendant and the plaintiff's provider were sufficient to determine whether the plaintiff's level of care was "medically necessary." (R. 432).

On March 18, 2011, MCMC through a physician Board Certified in Psychiatry (hereinafter "external reviewer") issued its final determination upholding the defendant's denial of coverage for partial hospitalization treatment beginning on  January 5, 2011. (R. 428-432). The external reviewer described the plaintiff as:

> a 30 years old female with an eating disorder associated with restricted intake and weight loss. She was referred by her outpatient clinician on 12/14/10 following an exacerbation of her psychiatric disorders and worsening of her eating disorder.

(R. 430). He summarized the plaintiff's medical history as follows:

> The patient has a 17 year history of eating disorder associated with significant weight restriction, currently to a weight at approximately 85% of ideal body weight at five feet and six inches. She has recently exhibited restricted intake together [with] a history of multiple relapses requiring hospitalization (19 times) with three or those hospitalizations over the past year or so.
>
> Her eating disorder onset has been perpetuated by stressors at home and an anxiety disorder, obsessive compulsive disorder (OCD) that is often associated with major depression during relapses. Recent efforts to treat her with medications and supportive psychotherapy and outpatient nutritional counseling and behavioral techniques have failed to ameliorate the eating problem. In fact, the patient has become increasingly depressed. She had not abused diuretics or laxatives or diet pills or engaged in compulsive exercise, of late.
>
> Psychiatric history includes an anxiety disorder with depressed mood. There is a history of self-destructive or suicidal behaviors. Additionally, the patient has frequently been hospitalized for stabilization of low weight and

complications of her eating disorder, as noted above.

***

Psychosocial history revealed a supportive family and friends with a sober home environment. There is no current abuse of alcohol or drugs of abuse.

(R. 430).  In the March 18, 2011 determination, the external reviewer further stated:

This patient did not require the structure of a partial hospital setting in order to be effectively and intensively treated. Moreover, resolving the perpetuating factors pertinent to her treatment of the eating disorder could be effectively addressed at a lower level of care.

The co-morbid psychiatric disturbances could also be addressed in a less restrictive treatment setting. The patient did not have general medical instability or laboratory abnormalities that would have prompted the need for partial hospital level of care.

(R. 432). It was the opinion of the external reviewer that partial hospitalization was not

medically necessary, in part, because:

The patient's clinical condition could be safely and effectively managed at a lower level-of-care. The structure of a partial hospital setting and monitored meals were not necessary, as the patient was not binge eating or purging. More importantly, the patient had achieved a body weight above 90% of ideal body weight, was eating 100% of her meals and snacks and was cooperative and motivated to participate in treatment.

The patient's psychiatric disturbances had improved and did not exhibit severe symptoms, such as suicidal ideation, psychosis, cognitive impairment or aggressive or suicidal behaviors. The patient had not been using substances or abuse. She also enjoyed satisfactory psychosocial and family supports.

Id.

On November 2, 2011, the plaintiff filed the instant action pursuant to ERISA to

contest defendant's denial of benefits (partial hospitalization treatment beginning on

January 5, 2011) under the Plan.

**F.      The Plaintiff's Discovery Efforts Directed at MCMC**

During the course of this litigation, the plaintiff served a subpoena <u>duces</u> <u>tecum</u> and a Rule 30(b)(6) deposition notice on non-party MCMC.[8] On or about May 28, 2014, MCMC moved for a protective order in the United States District Court for the District of Massachusetts. <u>See</u> Motion of MCMC LLC for a Protective Order (172-1, 10/15/14). In its motion, MCMC stated it "provides external and internal reviews to UHC [United HealthCare Services, Inc.][9] and some of its affiliates and has done so for many years" and consequently, "MCMC's search for the information necessary to prepare its witnesses to testify about the topics listed in the [plaintiff's] subpoena will involve many hours and will be expensive." <u>Id.</u> at 4 (footnote added).

On July 17, 2014, MCMC's attorney also wrote a letter to the plaintiff's counsel. The letter states in part:

> **[The external reviewer] prepared approximately 200 reports between 2007 and 2011.** In order to provide you with the number of his reports that address the various medical situations that you have itemized, MCMC

---

[8] In its motion for protective order filed in another district court, MCMC refers to "Plaintiff's Rule 30(b)(6) subpoena." <u>See</u> Motion of MCMC LLC for a Protective Order (DE# 172-1 at 20, 10/15/14). The undersigned assumes MCMC is referring to a Rule 30(b)(6) notice of deposition with a Rule 45 subpoena <u>duces</u> <u>tecum</u>.

[9] In its motion for protective order, MCMC states:

Oxford apparently is an affiliate of United HealthCare Services, Inc. ("UHC") (see www.unitedhealthcareonline.com/b2c/CmaAction.do?). According to UHC's website, it "is an operating division of UnitedHealth Group, the largest single health carrier in the United States" and its "family of companies delivers innovative products and services to approximately 70 million Americans." (see http://www.uhc.com/about_us.htm).

<u>See</u> Motion of MCMC LLC for a Protective Order (DE# 172-1 at 4, 10/15/14).

would have to assign someone to read each of those reports and categorize them in accordance with your request.

**You then want MCMC to do something similar for all reports that MCMC provided to UHC between 2007 and 2011. MCMC has not looked at how many reports it prepared for UHC during that time (although it is certainly greater than 200)** because MCMC will not engage in that determination given the related labor and expense that would be required to conduct the analysis that you want MCMC to perform.

July 17, 2014 Letter (DE# 172-2 at 2, 10/15/14) (emphasis added).

## STANDARD OF REVIEW

The standard for summary judgment in ERISA cases is different from the standard applicable to general motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. In an ERISA benefit denial case, "the district court sits more as an appellate tribunal than as a trial court," not taking evidence, but instead "evaluat[ing] the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Curran v. Kemper Nat'l Servs., Inc., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005) (quoting Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002)). "The usual tests such as whether a genuine issue of material fact exists, do not apply." Epolito v. Prudential Ins. Co. of Am., 737 F. Supp. 2d 1364, 1370 (M.D. Fla. 2010).

"ERISA provides no standard for reviewing decisions of plan administrators or plan fiduciaries." Manning v. Johnson & Johnson Pension Comm., 504 F. Supp. 2d 1293, 1301 (M.D. Fla. 2007) (citing Firestone Fire & Rubber Co. v. Bruch, 489 U.S. 101, 109 (1989)). "After Firestone, the Eleventh Circuit adopted three separate standards for reviewing administrators' plan decisions: '(1) de novo where the plan does not grant the

19

administrator discretion [i.e., the administrator does not exercise discretion in denying

claims]; (2) arbitrary and capricious [where] the plan grants the administrator [such]

discretion; and (3) heightened arbitrary and capricious where [the plan grants the

administrator such discretion but] . . . [he has] . . . a conflict of interest.'" Manning, 504

F. Supp. 2d at 1301 (quoting Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132,

1134-35 (11th Cir. 2004) (quoting HCA Health Svcs. of Ga., Inc.  v. Emp'rs Health Ins.

Co., 240 F.3d 982, 993 (11th Cir. 2001) (citations omitted; alterations in original)).

When reviewing denials of benefits under ERISA plans, the Eleventh Circuit

applies the following procedure:

> (1) Apply the de novo standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (i.e., the court disagrees
> with the administrator's decision); if not, then end the inquiry and affirm
> the decision.

> (2) If the administrator's decision in fact is "de novo wrong," then
> determine whether he was vested with discretion in reviewing claims; if
> not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is "de novo wrong" and he was vested
> with discretion in reviewing claims, then determine whether "reasonable"
> grounds supported it (hence, review his decision under the more
> deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the
> administrator's decision; if reasonable grounds exist, then determine if he
> operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict of interest, then apply heightened arbitrary and
> capricious review to affirm or deny it.

Helms v. Gen. Dynamics Corp., 222 F. App'x 821, 827-28 (11th Cir. 2007) (quoting

Williams, 373 F.3d at 1137-38 (footnotes omitted)).

In the instant case, this Court has already determined that a de novo standard of review applies:

> now that the Court recognizes that the external appeal constitutes a part of the record informing Defendant's ultimate denial of benefits in this case, and **in view of the reality that the external appeal decision removed the plan administrator's discretion, the Court determines that a de novo review must apply.**
>
> * * *
>
> [T]he Court here concludes that the New York statute, in providing an optional, yet binding, process effectively mandates that a plan be designed to remove the administrator's discretion, should the beneficiary choose to pursue an external appeal. **Accordingly, as the New York external-appeal process requires a plan to divest its discretion in favor of the external reviewer's decision, a de novo standard of review is appropriate here.**

Alexandra H. v. Oxford Health Ins., Inc., No. 11-23948-CIV, 2013 WL 4002883, at *8-9 (S.D. Fla. Aug. 6, 2013) (Rosenbaum, J.) (emphasis added). In a subsequent opinion, this Court also stated that: "the external appeal upholding Plaintiff's denial of benefits [wa]s conclusive as to the issue of medical necessity, but Plaintiff [could] conduct discovery as to whether the external reviewer had any conflict of interest that may have biased the decision." Alexandra H. v. Oxford Health Ins., Inc., No. 11-23948-CIV, 2014 WL 1659939, at *1 (S.D. Fla. Apr. 25, 2014) (Rosenbaum, J.). Thus, this Court limited the extent to which the plaintiff could challenge the external reviewer's determination on the "medical necessity" issue:

> As noted in the Court's previous Order, the language in the Rush [Prudential HMO, Inc. v. Moran, 536 U.S. 355 (2002)] opinion indicates that a binding external reviewer's decision is dispositive as to what is "medically necessary." Rush, 536 U.S. at 380. As a result, **MCMC's determination that inpatient treatment is not medically necessary is conclusive as to that issue here.**

21

But <u>Rush</u> **did leave open the possibility for other avenues of relief. For example, even where the independent reviewer renders the final word on what is necessary, a court is still responsible for determining "whether other aspects of the plan ( beyond the "medical necessity" of a particular treatment) affect the relative rights of the parties."** <u>Id.</u> at 380 n. 10 (emphasis added). Moreover, a reviewer's judgment "could be challenged as inaccurate or biased." <u>Id.</u> In other words, **although an external reviewer's medical-necessity determination is definitive, such a result does not prevent an insured from challenging the appeal on grounds independent of that determination**.

Here, Plaintiff directly contests the external reviewer's decision as to what is medically necessary. Although the argument is couched in terms of "inaccuracy," Plaintiff in fact seeks a determination from this Court that the appeal was wrongly decided, which is directly at odds with <u>Rush</u>'s suggestion that the appeal is dispositive as to the medical-necessity dispute. As discussed above, although <u>Rush</u> proposed the possibility that an insured could challenge a reviewer's judgment for inaccuracy, **such a challenge must necessarily be separate and apart from the medical-necessity determination.** Otherwise, the reviewer's determination of what is medically necessary would not actually be dispositive.

**Contrary to Plaintiff's suggestion, the term "inaccurate" does not simply mean "wrong" in this context. Rather, in its broadest sense, "inaccuracy" refers to errors and omissions so obvious that they require no second-guessing.** For example, the external reviewer's decision would be inaccurate **if it purported to rely on medical records belonging to another patient or if he analyzed the medical necessity of a treatment other than the one in dispute**—in other words, **blatant discrepancies that do not require judgment or scrutiny.** No such errors have been cited here.

Moreover, although <u>Rush</u> did not elucidate what the term "inaccurate" means as a matter of law, its use of the word in conjunction with "biased" is fairly telling and indicates that, **in this context, "inaccuracy" may also relate to an external reviewer's possible conflict of interest.** Such an interpretation finds support in a later Supreme Court case, <u>Metropolitan Life Insurance Co. v. Glenn</u>, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008), in which the Court analyzed an issue relating to an ERISA plan administrator's conflict of interest. Significantly, the Court repeatedly juxtaposed the two terms, utilizing the

term "accurate" as an antonym for "biased." <u>See</u> 554 U.S. 105, 114, 128
S.Ct. 2343, 171 L.Ed.2d 299 (2008) ("[C]laims processing . . . falls below
par when it seeks a biased result, rather than an accurate one.")
(emphasis added); <u>id.</u> at 118 (A plan administrator's conflict of interest
"should prove less important . . . where the administrator has taken active
steps to reduce potential bias and to promote accuracy" ) (emphasis
added). This interpretation of "inaccuracy" is in harmony with <u>Rush</u>.

Ultimately, review of Plaintiff's external appeal with respect to what
treatment is medically necessary **is limited to whether other
independent factors may have contributed to an erroneous denial of
benefits, not whether the Court agrees or disagrees with the
reviewer's conclusions**. Because the Court has already held that the
external reviewer's determination of medical necessity is dispositive in this
case, Plaintiff cannot seek to challenge the decision as incorrect based
upon the sufficiency of the evidence in the record.

<u>Id.</u> at *4-5 (emphasis added; footnote omitted). The plaintiff moved for reconsideration

of this Order which the Court denied. <u>See</u>  <u>Alexandra H. v. Oxford Health Ins., Inc.</u>, No.

11-23948-CIV, 2014 WL 2587709, at *1 (S.D. Fla. Jun. 10, 2014) (Moreno, J.).

These prior Orders are the law of the case. The Court and the parties are bound

by them. <u>See</u> <u>Outside the Box Innovations, LLC v. Travel Caddy, Inc.</u>, 695 F.3d 1285,

1301 (11th Cir. 2012) (recognizing that "[a]s a general rule, the law of the case doctrine

prohibits a court from revisiting an issue once it has been decided in pending litigation.")

(citations and internal quotation marks omitted).  Accordingly, in this Report and

Recommendation, the undersigned will apply a <u>de</u> <u>novo</u> standard of review and will

consider the parties' arguments in light of the Court's rulings.

## <u>ANALYSIS</u>

The parties have filed cross-motions for summary judgment. The undersigned

will address the plaintiff's motion first.

23

**A.    Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172)**

In order to prevail on summary judgment, the plaintiff must show that the external reviewer's determination that partial hospitalization was not medically necessary beginning on January 5, 2011 was: (1) tainted by bias or (2) inaccurate. See Alexandra H. v. Oxford Health Ins., Inc., No. 11-23948-CIV, 2014 WL 1659939, at *4-5 (S.D. Fla. Apr. 25, 2014).[10] The plaintiff argues that MCMC and the external reviewer in the instant case were operating under a financial conflict of interest. See Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172 at 9, 10/15/14). She also argues that:

> [The external reviewer's] determination is fundamentally inaccurate and tainted by bias, as it is founded on patently false assertions[.] [The external reviewer] assessed the medical necessity of partial hospitalization for the wrong psychological condition, and the Plan terms were never actually assessed, stripping Alexandra H. of her right to a full and fair review of her claim. Thus, Defendant's denial of health insurance coverage was de novo wrong.

Id. at 21 (underline added). The undersigned will address the plaintiff's arguments below.

---

[10] It is clear from this Court's prior ruling that "bias" is a form of "inaccuracy." See Alexandra H., 2014 WL 1659939, at *5 (stating that the term "'inaccuracy' may also relate to an external reviewer's possible conflict of interest."). Because there are other ways (apart from bias) which the plaintiff can show the external reviewer's decision was "inaccurate," the undersigned will address "bias" and "inaccuracy" as separate components.

i.      **The External Reviewer's Determination on the Issue of Medical Necessity Was Not Tainted by Bias**

In her summary judgment motion, the plaintiff argues that:

> MCMC admitted that it has a long-standing relationship outside of the New York external appeal process with United Health Care, Inc., (Defendant's parent company and the entity listed on the subject health plan) ("UHC") and its affiliates. See Exhibit 1, p. 4-5. In fact, MCMC has conducted so many medical records reviews for UHC, that MCMC asserts that it would be extremely time consuming and expensive to provide Plaintiff information pertaining to same and if compelled to do so, would require over two months to prepare a 30(b)(6) witness to testify regarding the information. See id. Significantly, **[the external reviewer in the instant case] has a longstanding financial relationship with MCMC as one of its frequently utilized reviewing physicians, conducting numerous reviews per month, for several years.** See Exhibit 2, p. 2. Defendant knew that MCMC was assigned to Alexandra H.'s case and MCMC knew that it was reviewing a case involving a UHC plan. **The long established financial relationship between MCMC and U[HC] and its affiliates renders it more likely that MCMC was financially motivated to provide U[HC] companies, such as Oxford, with medical review reports that support claim denials**, whether those reviews are provided as part of the New York external review process or not. **Likewise, [the external reviewer's] status as a frequently utilized MCMC medical reviewer renders it more likely that he was financially motivated to prepare reports that increase MCMC's profitability.** Moreover, **it is abundantly clear that this financial conflict of interest directly influenced the external appeal decision.** The external appeal decision was not simply medical [sic] unsound and unsupported, but was premised on blatantly false assertions, the medical necessity of treatment for the wrong condition was considered, and the Plan terms were ignored.

Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof

(DE# 172 at 9-10, 10/15/14) (emphasis added; footnotes omitted).

The plaintiff has not shown that the external reviewer's determination on the

issue of medical necessity was tainted by a potential conflict of interest or that he was

otherwise biased. Putting aside questions of admissibility, which neither party has

addressed in substance, the plaintiff has shown in its filings in this case that MCMC stated it "provides external and internal reviews of UHC and some of its affiliates and has done so for many years" and consequently, "MCMC's search for the information necessary to prepare its witnesses to testify about the topics listed in the [plaintiff's] subpoena will involve many hours and will be expensive." Motion of MCMC LLC for a Protective Order (172-1 at 4, 10/15/14). The plaintiff has also shown that in a letter dated July 17, 2014, MCMC's attorney stated:

> **[The external reviewer] prepared approximately 200 reports between 2007 and 2011.** In order to provide you with the number of his reports that address the various medical situations that you have itemized, MCMC would have to assign someone to read each of those reports and categorize them in accordance with your request.
>
> **You then want MCMC to do something similar for all reports that MCMC provided to UHC between 2007 and 2011. MCMC has not looked at how many reports it prepared for UHC during that time (although it is certainly greater than 200)** because MCMC will not engage in that determination given the related labor and expense that would be required to conduct the analysis that you want MCMC to perform.

July 17, 2014 Letter (DE# 172-2 at 2, 10/15/14) (emphasis added). This letter merely evidences that over a period of four years, the external reviewer prepared approximately 200 reports. It is unclear from this letter whether those 200 reports were prepared on Oxford plans or whether they were prepared on behalf of MCMC for other plans. Even assuming these reports were prepared exclusively on Oxford plans, there is no indication of what the outcome of those reports were or whether they show a tendency for the external reviewer to issue decisions favorable to Oxford.

There is also no record evidence that the external reviewer had a financial

incentive to rule in favor of Oxford. Pursuant to the applicable New York statute,

an external appeal is randomly assigned to an external appeal agent. See N.Y. Ins. Law

§ 4914(a). In this case, MCMC (the external appeal agent) was assigned **at random** to

the plaintiff's external appeal and it in turn appointed the external reviewer whose

identity was not known to the parties at the time.[11] Because of the random nature in

which MCMC is appointed to review external appeals, there can be no correlation

between the number of favorable determinations the external reviewer provides to

Oxford (or other insurance companies) and the number of appeals MCMC is assigned.

By statute, Oxford has no say on which entity will be appointed as the external appeal

agent on its cases or who that entity will assign as the external reviewer. Thus, whether

the external reviewer generated favorable determinations to Oxford or to any other

insurance company has no bearing on whether MCMC will be selected (at random) to

review more external appeals. Neither MCMC nor the external reviewer had a financial

incentive to rule in favor of the defendant and against the plaintiff.

There is also no record evidence showing that a denial of the plaintiff's claim for

partial hospitalization would necessarily result in a financial gain to the defendant.[12]

Under the plan, the defendant would still have been obligated to pay for the plaintiff's

---

[11] The external reviewer's identity was not disclosed to the parties in the instant case until the plaintiff propounded third-party discovery on MCMC.

[12] As the defendant has noted, the plaintiff "presents no evidence to show that intensive outpatient therapy would have been less expensive than the partial hospitalization." See Defendant Oxford Health Insurance, Inc.'s Reply on its Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 181 at 11, 11/3/14).

medical treatment in the form of intensive outpatient therapy. While the Court could assume that partial hospitalization would be more costly than intensive outpatient therapy, the plaintiff has pointed to no record evidence indicating the actual cost of both treatments.

Based on this record, the undersigned concludes that the plaintiff has failed to show that the external reviewer was operating under a potential conflict of interest when he determined that partial hospitalization was not medically necessary beginning on January 5, 2011 in the instant case, or that he was otherwise biased. The plaintiff's remaining argument – that "[t]he external appeal decision was . . . premised on blatantly false assertions, the medical necessity of treatment for the wrong condition was considered, and the Plan terms were ignored" – will be addressed below.

### ii.    The External Reviewer's Determination on the Issue of Medical Necessity Was Not Inaccurate

As discussed above, this Court has already stated that:

> Contrary to Plaintiff's suggestion, the term "inaccurate" does not simply mean "wrong" in this context. Rather, in its broadest sense, "inaccuracy" refers to errors and omissions so obvious that they require no second-guessing. For example, the external reviewer's decision would be inaccurate if it purported to rely on medical records belonging to another patient or if he analyzed the medical necessity of a treatment other than the one in dispute – in other words, blatant discrepancies that do not require judgment or scrutiny. No such errors have been cited here.

Alexandra H., 2014 WL 1659939, at *4. The plaintiff acknowledges that the Court provided examples of ways in which the plaintiff could permissibly challenge the external reviewer's determination and this is not an exhaustive list. See Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172

at 8, 10/15/14).

### (a.)   The External Reviewer's Alleged Failure to Consider the APA Guidelines and Reliance on the Wrong Criteria

The plaintiff argues that the external reviewer's determination that partial hospitalization was not medically necessary beginning on January 5, 2011 is at odds with the American Psychiatric Association's ("APA") Practice Guideline for the Treatment of Patients With Eating Disorders (3d Ed. 2006). See Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172 at 10 n.8, 10/15/14). Specifically, the plaintiff takes issue with the following sentence from the external reviewer's determination: "[t]he patient did not have general medical instability or laboratory abnormalities that would have prompted the need for partial hospitalization level of care." Id. at 10 (quoting R. 432). According to the plaintiff, this one sentence is evidence that the external reviewer either did not review the APA guidelines or "purposefully ignored them" because the APA guidelines "for partial level of care actually sets forth that partial hospitalization is appropriate for patients who are "[m]edically stable to the extent that more extensive medical monitoring is not required . . . ." Id. at 10-11 (emphasis omitted).

The plaintiff notes that "[the external reviewer] does not provide an analysis of the APA Practice Guidelines, attempt to analyze their applicability to Alexandra H.'s psychological information, or even quote the APA criteria, as the inconsistency would be readily apparent." Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172 at 11, 10/15/14). According to the plaintiff:

> This is a "blatant discrepancy" that establishes that [the external

29

reviewer's] decision regarding the medical necessity of partial
hospitalization is founded on a completely false premise, rendering it
inherently inaccurate. Either [the external reviewer] did not actually review
the APA guidelines (despite specifically alleging the contrary) or he
purposefully ignored them. Either way, [the external reviewer's]
undeniable misrepresentation strongly suggests that his decision was
tainted by bias.

Id.

     The undersigned is unpersuaded by the plaintiff's argument that the external

reviewer ignored the APA guidelines. Of note, the external reviewer cites to the APA

guidelines in his determination. (R. 432). In any event, the plaintiff would need to show

something other than "the appeal was wrongly decided." See  Alexandra H., 2014 WL

1659939, at *4 (recognizing that a finding that the appeal was wrongly decided would

be "directly at odds with Rush's suggestion that the appeal is dispositive as to the

medical-necessity dispute.").

     Next, the plaintiff quotes at length from a letter dated January 17, 2011 and

signed by Dr. Wendy Oliver-Pyatt and four other medical professionals from the

Oliver-Pyatt Centers. See Plaintiff's Motion for Summary Judgment and Memorandum

of Law in Support Thereof (DE# 172 at 11-13, 10/15/14) (quoting R. 474-72). The

plaintiff notes that Dr. Oliver-Pyatt applied the APA guidelines to the plaintiff's case and

concluded that partial hospitalization was medically necessary in the plaintiff's case.

The plaintiff states that "the information [the external reviewer] allegedly considered

contained [this] detailed analysis by Dr. Oliver-Pyatt." Id. at 11. According to the plaintiff,

"[the external reviewer's] determination was not only entirely inaccurate, but 'completely

unreasonable because it is not supported by any fair interpretation of the evidence,'

strongly suggesting that it was tainted by bias." Id. at 13 (quoting Demyan v .Sun Life

<u>Assurance Co. of Canada</u>, 148 F. Supp. 2d 1316, 1321 (S.D. Fla. 2001)).

The plaintiff has not pointed to any "blatant discrepancies" between the record and the external reviewer's determination "that do not require judgment or scrutiny." <u>Alexandra H.</u>, 2014 WL 1659939, at *4. At most, the plaintiff has shown that the external reviewer's determination is at odds with the opinions of Dr. Wendy Oliver-Pyatt and other medical professionals at the Oliver-Pyatt Centers. (R. 468-473). A disagreement with the external reviewer's determination of medical necessity is not enough. This Court has already ruled that such a showing is legally insufficient to entitle the plaintiff to relief under ERISA because the external reviewer's determination on medically necessity was "binding" on the parties, as that term was interpreted by the Supreme Court in the <u>Rush</u> opinion. <u>See</u> <u>Alexandra H.</u>, 2014 WL 1659939, at *5 (stating that "[b]ecause the Court has already held that the external reviewer's determination of medical necessity is dispositive in this case, Plaintiff cannot seek to challenge the decision as incorrect based upon the sufficiency of the evidence in the record.").

The plaintiff also argues that the Plan did not require her to show:

> "medical instability" or "laboratory abnormalities" to establish the medical necessity for partial hospitalization and therefore, it is entirely unreasonable to require this stringent standard to approve a claim. This is especially true in light of the fact that a need for a hospitalization based on a psychological condition very often will never be associated with laboratory abnormalities or medical instability.

Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172 at 13, 10/15/14). Again, the plaintiff focuses on one sentence in the external reviewer's determination: "[t]he patient did not have general medical instability or

laboratory abnormalities that would have prompted the need for partial hospitalization

level of care." (R. 432). The external reviewer's determination was not based solely on

a lack of laboratory abnormalities or medical instability. The external reviewer

determined that partial hospitalization was not medically necessary, in part, because:

> The patient's clinical condition could be safely and effectively managed at
> a lower level-of-care. The structure of a partial hospital setting and
> monitored meals were not necessary, as the patient was not binge eating
> or purging. More importantly, the patient had achieved a body weight
> above 90% of ideal body weight, was eating 100% of her meals and
> snacks and was cooperative and motivated to participate in treatment.
>
> The patient's psychiatric disturbances had improved and did not exhibit
> severe symptoms, such as suicidal ideation, psychosis, cognitive
> impairment or aggressive or suicidal behaviors. The patient had not been
> using substances or abuse. She also enjoyed satisfactory psychosocial
> and family supports.

(R. 432).

### (b.)    The External Reviewer's Alleged Use of the Wrong Definition

The plaintiff further argues that the external reviewer applied the wrong definition

of medical necessity: "[the external reviewer] never considered the definition of medical

necessity actually contained in the Plan and instead, applied this wrong definition of

'medical necessity' when rendering his decision . . . ." Plaintiff's Motion for Summary

Judgment and Memorandum of Law in Support Thereof (DE# 172 at 13, 10/15/14).

This argument was already raised by the plaintiff and rejected by this Court:

> **Plaintiff first asserts that the external reviewer's determination is
> inaccurate because he relied on a definition of "medically
> necessary" that is not found in the plan document.** Specifically,
> Plaintiff states that the external reviewer was asked to answer whether the
> provision of the disputed treatment could "reasonably be expected to be
> health beneficial for the patient and/or can withholding the treatment, in
> whole or in part, reasonably be expected to affect the patient's health

adversely." ECF No. 130 at 10. In contrast, the health plan defines "medically necessary" as those services or supplies required to treat the insured's illness or injury that are

> 1. Consistent with the symptoms or diagnosis and treatment of [the insured's] condition;
>
> 2. Appropriate with regard to standards of good medical practice;
>
> 3. Not solely for [the insured's] convenience; and
>
> 4. The most appropriate supply or level of service which can safely be provided. For inpatient services, it further means that [the insured's] condition cannot safely be diagnosed or treated on an outpatient basis.

ECF No. 130–1 at 113. Because the reviewer did not refer to the specific plan definition, Plaintiff suggests, his determination was necessarily inaccurate. **The Court respectfully disagrees.**

Although the question posed to the external reviewer describes "medically necessary" in different terms, **the Court finds no significance in this distinction.** First, no indication exists – and Plaintiff does not assert – that the result of the appeal would have been different – that is – that the appeal would have been decided in Plaintiff's favor had the "correct" definition been used.

Second, aside from the fact that the external reviewer explicitly stated that he relied upon the plan documents and coverage language in reaching his conclusion, see ECF No. 134–4 at 91, **it is evident from the record that the decision was consistent with the plan's definition of "medically necessary."** In particular, the external reviewer specifically determined that an inpatient stay was no longer medically necessary because Plaintiff's "clinical condition could be safely and effectively managed at a lower level of care." ECF No. 134–4 at 92. This determination accords with the plan's definition, which expressly provides that inpatient services are deemed medically necessary only where "the condition cannot safely be ... treated on an outpatient basis." **The external reviewer's conclusion that Plaintiff could safely be treated for her condition without further hospitalization plainly conforms to the standard articulated in the plan. As a result, Plaintiff's challenge on this basis fails.**

33

Alexandra H., 2014 WL 1659939, at *3 (emphasis added). The plaintiff sought

reconsideration of the Court's prior ruling and the Court denied that relief in a strongly

worded opinion. See Alexandra H., 2014 WL 2587709, at *2 (stating that "Plaintiff's

latest motion to 'reargue' these very same legal issues appears to be an effort to exploit

the fact that a new judge has been assigned to this action in the hope that perhaps a

different judge will view her arguments in a more favorable light.").

The Court has conclusively ruled that the external reviewer did not apply the

wrong definition of the term "medically necessary." This ruling is the law of the case.

Outside the Box Innovations, 695 F.3d at 1301. Thus, the plaintiff cannot once again

raise an argument that has been twice rejected by the Court on the merits and expect a

different outcome.

### (c.) The External Reviewer's Alleged Inappropriate Reliance on UBH Level of Care Guidelines and the Plaintiff's Compliance with Those Guidelines

The plaintiff argues both that the external reviewer inappropriately considered

the UBH Level of Care Guidelines because "these guidelines are simply not contained

or incorporated in the Plan" and that the plaintiff "unquestionably met the criteria

contained" in those guidelines. Plaintiff's Motion for Summary Judgment and

Memorandum of Law in Support Thereof (DE# 172 at 14, 10/15/14).

The plaintiff's argument that the external reviewer inappropriately considered the

UBH Level of Care Guidelines because "these guidelines are simply not contained or

incorporated in the Plan," Plaintiff's Motion for Summary Judgment and Memorandum

of Law in Support Thereof (DE# 172 at 14, 10/15/14), lacks merits. The Plan states:

"[Oxford] may adopt reasonable policies, procedures, rules and interpretations to

promote the orderly and efficient administration of this Certificate with which Members

shall comply." (R. 381). According to the defendant, "[t]he guidelines are designed to

support proactive case management to diminish delays in obtaining consultations,

diagnostic tests, decision-making, and discharge planning." (R. 433).

A case manager (R. 519) and UBH medical directors (R. 530, 517, 461)

referenced the UBH Level of Care Guidelines in evaluating the medical necessity of the

plaintiff's request for partial hospitalization treatment well before the external reviewer

was assigned to the appeal. Moreover, before the external appeal, the plaintiff was

provided with an opportunity to obtain copies of all documents including the UBH Level

of Care Guidelines:

> **ERISA Disclosure Requirements**
> We denied this appeal because the claim does not meet criteria
> established by the member's plan. **If the member would like a copy of
> the criteria used or any documents, records, and other information
> relevant to this claim**, the member must send a written request to ERISA
> Disclosure Requests, c/o UBH, 1900 E. Golf Road, Suite 300,
> Schaumburg, IL 60173-5088. **This information will be provided to the
> member free of charge.**

(R. 463) (emphasis added). Thus, the undersigned is unpersuaded by the plaintiff's

argument that the external reviewer impermissibly relied on the UBH Level of Care

Guidelines when he determined that inpatient hospitalization was not medically

necessary in the plaintiff's case.

The undersigned is similarly unpersuaded by the plaintiff's alternative argument

that she "unquestionably met the criteria contained" in the UBH Level of Care

Guidelines. <u>See</u> Plaintiff's Motion for Summary Judgment and Memorandum of Law in

Support Thereof (DE# 172 at 14, 10/15/14). In support of this argument, the plaintiff

maintains that:

> The [Oliver-Pyatt Centers] Program was providing the intense individualized care needed to address Alexandra H.'s complicated conditions. (468-73). Alexandra H. was actively participating in her treatment, her treatment notes establish that her symptoms were being addressed adequately, and realistic goals were set for her treatment. <u>See id.</u>; (468-73; 506-16; 1009-13). Moreover, the [Oliver-Pyatt Centers] team frequently reassessed Alexandra H.'s treatment to address her symptoms. (506-16). Dr. Oliver-Pyatt explained that while Alexandra H. was showing signs of improvement, her condition would deteriorate if she was released to a lower level of care and given her severe depression and recent suicide attempt it was unsafe for her to be discharged, rendering it unsafe for her to terminate partial level care. (468-73).  Alexandra H.'s family was participating in her treatment and the [Oliver-Pyatt Centers] team had a comprehensive discharge plan that took into account Alexandra H.'s recovery plan and goals. (468-73; 506-16; 1009-13). Clearly, Alexandra H. continued to require partial hospitalization for her severe condition, **the treatment was medically necessary as defined by the Plan, The APA Guidelines, and UHC's Guidelines and [the external reviewer's] determination was not simply inaccurate, but "completely unreasonable because it is not supported by any fair interpretation of the evidence**."

<u>Id.</u> at 16 (emphasis added) (citing <u>Demyan</u>, 148 F. Supp. 2d at 1321).

The plaintiff cannot simply argue that the external reviewer's medical necessity

determination was wrong and expect to prevail on summary judgment. As this Court

explained in its prior ruling:

> Plaintiff's main argument, however, is that the decision was inaccurate because insufficient evidence supported the reviewer's determination. In support of this position, **Plaintiff thoroughly recounts Plaintiff's clinical records, asserting that the evidence significantly undercuts the external reviewer's medical-necessity determination and supports Plaintiff's purported need for further inpatient treatment.** While the Court is sympathetic to Plaintiff's illness and sincerely hopes her condition improves, **Plaintiff's argument lacks merit in light of this Court's**

36

> **previous Order. Specifically, Plaintiff appears to be requesting that the Court undertake review of the medical-necessity determination, which the Court has already determined to have been conclusively established by the external appeal**. Although Plaintiff purports to challenge the "accuracy" of the reviewer's judgment – a challenge that was impliedly contemplated by Rush – **Plaintiff appears simply to disagree with the external determination.**
>
> As noted in the Court's previous Order, the language in the Rush opinion indicates that a binding external reviewer's decision is dispositive as to what is "medically necessary." Rush, 536 U.S. at 380. As a result, MCMC's determination that inpatient treatment is not medically necessary is conclusive as to that issue here.

Alexandra H., 2014 WL 1659939, at *4 (emphasis added). The plaintiff cannot prevail on summary judgment on the basis that the external reviewer wrongly concluded that she did not meet the UBH Level of Care Guidelines.

### (d.)   The External Reviewer's Alleged Consideration of the Wrong Psychological Condition

The plaintiff also argues that the external reviewer considered the wrong psychological condition (bulimia) when he stated the plaintiff "was not binge eating or purging." Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172 at 16, 10/15/14). The plaintiff states that "[e]ven a cursory review of the medical evidence establishes that Alexandra H. was suffering from severe anorexia nervosa (restricting type) with co-morbid major depression (which manifests in severe food restriction), not bulimia (which manifests in binging and purging of food)." Id. (footnote omitted). The plaintiff herself acknowledges that there are references in the medical records to the plaintiff expressing a desire to purge food, but attributes this to the treatment she was receiving at the Oliver-Pyatt Centers: "While there are a few references to Alexandra H. having a desire to purge food, this was only because she

was being compelled to eat at Oliver-Pyatt Centers and was unable to restrict her food

intake due to constant supervision." Id. at 17. According to the plaintiff, the external

reviewer's purported consideration of bulimia "is a blatant discrepancy establishing that

[the external reviewer] did not actually consider Alexandra H.'s psychological disorder

when assessing the medical necessity of treatment. This renders the decision

fundamentally inaccurate, as the treatment for anorexia nervosa and bulimia are often

entirely different." Id.

> The plaintiff reasons that:
>
> **If [the external reviewer] actually considered whether partial hospitalization was necessary to treat Alexandra H.'s anorexia nervosa (i.e., to prevent her from engaging in severe food restriction) and not bulimia (i.e., to prevent binging and purging food), he simply could not have reached this decision.** This is because, the psychological records during the time frame of Defendant's termination of Alexandra H.'s partial hospitalization coverage establish that Alexandra H. was in fact restricting her food intake, struggling with compliance with her food intake plan, and she actually began to experience a compulsion to purge after being forced to eat during her treatment at Oliver-Pyatt Centers. . . . Thus, **partial hospitalization and monitoring at meals was medically necessary to prevent Alexandra H. from severely restricting her food intake.**

Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172

at 17, 10/15/14) (footnote omitted; emphasis added).

In a prior Order, this Court listed, by way of example, the external reviewer

"analyz[ing] the medical necessity of a treatment other than the one in dispute" as an

appropriate challenge to the inaccuracy of the external reviewer's determination. See

Alexandra H., 2014 WL 1659939, at *4. That is not what occurred here. Taking into

consideration the external reviewer's determination as a whole (R. 428-32), it does not

38

appear that the external reviewer was operating under the mistaken belief that the plaintiff suffered from bulimia. Notably, the external reviewer described the plaintiff as "a 30 years old female with an eating disorder associated with **restricted intake** and weight loss." (R. 430) (emphasis added). He further noted that: "She has recently exhibited **restricted intake** together [with] a history of multiple relapses requiring hospitalization . . . ." Id. (emphasis added). The external reviewer listed the plaintiff's diagnoses as including "anorexia nervosa, restricting type" and did not include bulimia in that list. (R. 431). Thus, the plaintiff has not shown that the external reviewer's determination was "inaccurate" as defined by this Court's prior Orders and consistent with Supreme Court's decision in Rush.

The plaintiff also argues that "there are blatant discrepancies between what [the external reviewer] claims the [medical] records state and what is actually written." Id. According to the plaintiff, the external reviewer's statements regarding her medical records "are patently false and intentionally misleading, establishing that his opinion is fundamentally inaccurate and suggesting that it was infected by bias." Id. at 18. The plaintiff maintains that "[the external reviewer's] opinion was founded on unquestionably false assertions, rendering his decision clearly inaccurate. . . . [His] false statements are so flagrant, that it also strongly suggests that his opinion was infected by bias." Id. at 19-20.[13] Again, whether the external reviewer's determination on medical necessity was

_____

[13] In arguing that the external reviewer was purportedly biased, it appears that the plaintiff is attacking the correctness of the external reviewer's determination on medical necessity which this Court has already held is binding upon the parties. For instance, the plaintiff argues that:

supported by the record, or otherwise correct, is not the proper inquiry here. See Alexandra H., 2014 WL 1659939, at *4.

In sum, the term "inaccurate" does not mean that the external reviewer's determination was wrongly decided or that "the decision [was] incorrect based upon the sufficiency of the evidence in the record." Alexandra H., 2014 WL 1659939, at *4-5. It means "blatant discrepancies that do not require judgment or scrutiny." Id. at *4. The Court has made clear that it will not second-guess the external reviewer's medical necessity determination. Id. (stating that "Plaintiff appears to be requesting that the Court undertake review of the medical-necessity determination, which the Court has already determined to have been conclusively established by the external appeal."). Thus, in order to prevail on summary judgment, the plaintiff must show something more than a difference in medical opinion. The plaintiff must show that the external reviewer's determination was inaccurate or biased. The plaintiff has failed to make this showing.

_____

**[The external reviewer's] statements regarding the available psychological records are not simply unsupported and entirely selective, but irreconcilably false. His opinion is replete with obvious misrepresentations, which directly involve information that is material to the medical necessity determination.** This renders [the external reviewer's] opinion entirely inaccurate, and further "completely unreasonable because it is not supported by any fair interpretation of the evidence," strongly suggesting that it was tainted by bias.

Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172 at 20, 10/15/14) (emphasis added). This Court noted similar problems with the Plaintiff's Response to the Court's Order to Show Cause (DE# 130, 8/28/13). See Alexandra H., 2014 WL 1659939, at *4 (stating that "[a]lthough the argument is couched in terms of 'inaccuracy,' Plaintiff in fact seeks a determination from this Court that the appeal was wrongly decided, which is directly at odds with Rush's suggestion that the appeal is dispositive as to the medical-necessity dispute.").

The plaintiff has pointed to no "other independent factors [that] may have contributed to an erroneous denial of benefits . . . ." Id. at *5.

Having determined that the plaintiff has not shown that the external reviewer's determination was inaccurate or the product of bias, the undersigned recommends that the Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172, 10/15/14) be **DENIED**.

**B.     Defendant Oxford Health Insurance, Inc.'s Motion for Summary Judgment and Memorandum of Law in Support of Its Motion for Summary Judgment (DE# 164)**

The defendant argues that it is entitled to summary judgment in its favor for the following reasons:

> (1) the Plan does not provide benefits for services that [the defendant] determines are not "Medically Necessary"; (2) an External Appeal Review Agent determined that the services at issue were not "Medically Necessary"; (3) the Plan provides that the External Appeal Review Agent's determination is binding on all parties; and (4) this Court previously ruled that it cannot overturn the External Appeal Review Agent's medical necessity determination.

Defendant Oxford Health Insurance, Inc.'s Motion for Summary Judgment and Memorandum of Law in Support of Its Motion for Summary Judgment (DE# 164 at 15, 9/30/14).

The Complaint here challenges only the medical necessity determination. In the instant case, MCMC determined that partial hospitalization was not medically necessary beginning on January 5, 2011. (R. 432). MCMC's determination on medical necessity is binding on the parties. See Alexandra H., 2014 WL 1659939 at *4 (stating that "MCMC's determination that inpatient treatment is not medically necessary is

conclusive as to that issue here."). The plaintiff has failed to show that the medical necessity determination of the external reviewer (and by extension MCMC) was either inaccurate or tainted by bias. Accordingly, the defendant is entitled to summary judgment in its favor.

The defendant argues in the alternative that "to the extent the Court considers the substance of Oxford's determination . . . Plaintiff has not demonstrated any basis upon which to overturn Oxford's adverse benefit determination." Defendant Oxford Health Insurance, Inc.'s Reply on its Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 181 at 8, 11/3/14). It is unnecessary for the Court to address this secondary basis for summary judgment because the issue here is the external examiner's determination of medical necessity not the determinations made by Oxford's internal medical directors. In three separate Orders, this Court has affirmed its position that it is the external reviewer's determination of "medical necessity" that is binding on the parties in accordance with the Supreme Court's decision in Rush. See Alexandra H., 2013 WL 4002883, at *9;  Alexandra H., 2014 WL 1659939, at *4; Alexandra H., 2014 WL 2587709, at *1.

The Court should grant summary judgment for the defendant because the external reviewer's determination of medical necessity is binding on the parties and the plaintiff has not shown that this determination was either inaccurate or tainted by bias.

## **RECOMMENDATION**

In accordance with the foregoing, the undersigned respectfully RECOMMENDS that the Defendant Oxford Health Insurance, Inc.'s Motion for Summary Judgment and

Memorandum of Law in Support of Its Motion for Summary Judgment (DE# 164, 9/30/14) be **GRANTED** and the Plaintiff's Motion for Summary Judgment and Memorandum of Law in Support Thereof (DE# 172, 10/15/14) be **DENIED**.

The parties have fourteen (14) days from the date of receipt of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Court Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. See LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this **5th** day of March, 2015.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
United States District Judge Moreno
All counsel of record

43